1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF SUFFOLK: CRIMINAL TERM:  PART: 8
2   ----------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK      :
3                                            :
                                             :
4                    -against-              : Case Nos.:
    JULIE DEVUONO                            :
5   KIDS-ON-CALL PEDIATRIC                   :
    KIDS-ON-CALL PEDIATRIC NURSE PRACTITIONER:
6                                            :  IND-70771-23/001
                                             :  IND-70771-23/002
7                                            :  IND-70807-23/001
                                             :  IND-71631-23/001
8                                            :
                        Defendant(s).  :  Plea
9   ----------------------------------------x
                            210 Center Drive
10                          Riverhead, New York 11901
                            September 15, 2023
11

12  B E F O R E :

13      HONORABLE JOHN COLLINS
                SUPREME COURT JUSTICE
14

15  A P P E A R A N C E S :

16      FOR THE PEOPLE:
        RAYMOND TIERNEY, ESQ.
17      District Attorney of Suffolk County
        Criminal Courts Building
18      Riverhead, New York 11901
        BY:  CHRISTOPHER CLAYTON, ESQ.
19          JAMES BARTENS, ESQ.
            ADRIANA NOYOLA, ESQ.
20      Assistant District Attorneys

21      FOR THE DEFENDANT:
        THE LAW OFFICE OF GAITMAN & RUSSO
22      1103 Stewart Avenue
        Garden City, New York 11530
23      BY:  JASON RUSSO, ESQ.

24
                            DANIELLA CHAMBERLAIN
25                          SENIOR COURT REPORTER

1           (The following takes place in chambers among The

2     Court and counsel outside the hearing of the defendant.)

3           COURT CLERK:  Calling numbers five and 17, Julie

4     DeVuono, for motion and conference.

5           THE COURT:  We're gathered here in chambers with

6     the reporter, the clerk and the attorneys for the parties,

7     as well as a representative of Newsday Television,

8     Ms. Shari Einhorn, who has made, through a colleague, an

9     application for audiovisual coverage for today's

10    proceedings, and they are requesting videotape for later

11    broadcast, still photography for later publication.  And

12    the scope of the coverage being requested is throughout the

13    proceeding.

14          Let the record reflect that today is a regular

15    calendar appearance.  It is not -- it is not a sentencing.

16          And I will hear -- let's get all the appearances

17    on the record first as to those who are going to be

18    involved.

19          People?

20          MR. CLAYTON:  Christopher Clayton, Suffolk County

21    District Attorney's Office.

22          MR. RUSSO:  Jason Russo, Law Offices of Gaitman &

23    Russo, 1103 Stewart Avenue, Garden City, for Ms. DeVuono.

24          THE COURT:  Thank you.

25          Good afternoon, Mr. Russo.

1          Good afternoon, Mr. Clayton.

2          You've heard the application that's been made by

3    the Newsday organization, and pursuant to Article 131, I

4    will hear The People's position with respect to the

5    application at this time.

6          MR. CLAYTON:  We would rely on The Court,

7    Your Honor.

8          THE COURT:  Thank you.

9          And, Mr. Russo, I'll hear the defendant's

10   position, with a particular eye toward the categories

11   considered under Article 131 and Ms. DeVuono's position.

12         MR. RUSSO:  So, Judge, I've had a chance to confer

13   with my client about the application.  We were made aware

14   of it.  And we do have an objection to the filming, of

15   photography during the proceeding.

16         THE COURT:  Okay.  And what is the basis of that

17   objection?

18         MR. RUSSO:  Judge, the basis of the objection is

19   this is a -- a plea.

20         Judge, based upon the content of the plea and the

21   things that are going to be stated during the allocution, I

22   do believe that it could affect the rights potentially of

23   a -- of another defendant, who has a trial coming up before

24   Your Honor, and the coverage may interfere with law

25   enforcement activity related to that trial that's coming.

1          THE COURT:  Ms. Einhorn, I'll give you an

2     opportunity to add anything to your application that is not

3     already contemplated in the paperwork.

4          MS. EINHORN:  Thank you, Your Honor.

5          I think we would just respectfully like to

6     continue covering it the best we can.  We do have reporters

7     that will be reporting what happens in the court.  It's

8     just a different way of reporting it for our viewers and

9     our readers.

10          But if our application is denied today, we'll

11     reserve our right to submit it again during sentencing.

12          THE COURT:  Of course.  And that would be your

13     absolute right.

14          My concern, Ms. Einhorn, is even at this stage

15     there is still a presumption of innocence.  I'm concerned

16     that the institution perhaps of a camera or a camera person

17     or something along those lines could possibly interfere

18     with the progress going forward with the plea.

19          I'm concerned that Mr. Russo's client, although he

20     didn't say it, might balk in the process and have her focus

21     diverted from what's important now by the presence of a

22     recording camera.  And I do think such coverage could

23     interfere with the advancement of a fair proceeding and

24     potentially a fair trial should the plea not go forward.

25          Sometimes pleas have a -- they don't get where

1  they're anticipated to go sometimes for whatever reason,

2  and I'm not looking to invite any further distraction from

3  what is necessary to complete the agreement that has been

4  made to resolve all of these matters.

5  I've considered all of the factors that I'm

6  required to consider in Article 131.  I do believe the

7  coverage could possibly cause harm to Ms. DeVuono's resolve

8  to go forward at this point in time.

9  There is also the matter of the co-defendant,

10  Colletti, who is on the calender next week for either

11  disposition or to set a trial date, and I'm concerned that

12  coverage of the sort sought at this early stage could cause

13  a problem for the presentation in that case as I've

14  previously stated.

15  So, I have considered all the factors that 131

16  requires that I consider, and taking Mr. Russo's objection

17  to heart, I'm going to deny the application.

18  Of course, Ms. Einhorn, you're obviously welcome

19  to remain present and do the ordinary reporting things,

20  other than filming or recording the proceeding.

21  In light of the fact that I have denied your

22  application, you do have the opportunity to appeal my

23  decision to the District Administrative Judge, and he would

24  be available immediately to consider that appeal were you

25  so inclined to do so.

1          Are you so inclined?

2                MS. EINHORN:  Not at this time, Your Honor.

3                Thank you.

4                THE COURT:  Okay.  Thank you.

5                Well, you're gonna run out of time very quickly

6          because we're gonna go forward and we're gonna do it.  I do

7          not believe that was a hedge.  Perhaps you were speaking in

8          the vernacular.

9                But do you intend to appeal to the District --

10               MS. EINHORN:  I do not.

11               Thank you.

12               THE COURT:  Thank you, Ms. Einhorn.

13               The law also requires that I issue a written

14         decision in this regard, which will take us a few minutes

15         to prepare.  I will issue the written decision to all

16         parties in the courtroom in a short while, and we will move

17         forward with the proceeding.

18               Again, you and any of your colleagues are welcome

19         to stay and to observe throughout.

20               Thank you.

21               And it's nice to see you again.

22               MS. EINHORN:  Thank you.

23               You as well.

24               THE COURT:  Thank you, all.

25               And we'll reconvene in the courtroom in short

1    order.  We need to prepare the written decision that's

2    required.

3            Thank you.

4            (The following takes place on the record in open

5    court in the presence of The Court, counsel and the

6    defendant.)

7            COURT CLERK:  Calling numbers five and 17, on for

8    a conference and motion, Julie DeVuono; numbers ten and 19,

9    on for conference and motion, Julie DeVuono; number seven,

10   on for conference, Julie DeVuono; numbers six and 18,

11   Kids-On-Call Pediatrics, on for conference and motion; and

12   number 20, Kids-On-Call Pediatrics, on for arraignment and

13   motion.

14           (Whereupon, the defendant stepped up to the rail.)

15           THE COURT:  Thank you.

16           May we have appearances, please?

17           MR. BARTENS:  Assistant District Attorney Jim

18   Bartens.

19           MR. RUSSO:  Good afternoon.

20           Gaitman & Russo by Jason Russo, for Ms. DeVuono,

21   who is standing to my right.

22           THE COURT:  Thank you.

23           Off the record.

24           (Whereupon, a discussion was held off the record.)

25           COURT CLERK:  On the arraignment, 71631-23/002,

1    both sides are being presented with administrative orders.

2              THE COURT:  Thank you.

3              Good afternoon, Ms. DeVuono.

4              THE DEFENDANT:  Good afternoon.

5              THE COURT:  All right.  Gentlemen, prior to moving

6    forward with this proceeding, we did have a written

7    application by Newsday Television in the person of

8    Ms. Shari Einhorn.  Although she's not the applicant on the

9    paperwork, some of her colleagues were.  And we did have

10   the requisite hearing in chambers, at which time both

11   parties were permitted to give their take on the

12   application, as well as Ms. Einhorn.

13             And after careful consideration of all the factors

14   outlined in Article 131 of the rules of the Chief

15   Administrative Judge, This Court has decided to deny the

16   application.

17             Ms. Einhorn was so informed in chambers before

18   coming back to the courtroom.  I have issued the written

19   decision, also required by Article 131, and a copy of the

20   written decision has been provided to Mr. Bartens,

21   Mr. Russo and now Ms. Einhorn.

22             Ms. Einhorn was also inquired of by The Court as

23   to whether or not she chose to appeal my decision to the

24   District Administrative Judge, as is her right, and she

25   declined to do so.

-PROCEEDINGS-

1            Is that correct, Ms. Einhorn?

2            MS. EINHORN:  That's correct, Your Honor.

3            THE COURT:  Thank you, ma'am.

4            And, again, now everybody has the decision and

5       we're prepared to move forward.

6            MR. RUSSO:  Yes, Your Honor.

7            THE COURT:  Again, Mr. Russo, Mr. Bartens, good

8       afternoon.

9            With respect to 71631-23, do each of you

10      acknowledge receipt of a copy of the written order of the

11      Chief Administrative Judge, which reminds and advises each

12      of you of some of your various responsibilities to your

13      respective clients?

14           MR. RUSSO:  Yes, Your Honor.

15           MR. BARTENS:  Yes, Your Honor.

16           THE COURT:  This is with respect to the

17      corporation --

18           MR. RUSSO:  Correct.

19           THE COURT:  -- as we previously discussed.

20           And, Mr. Russo, do you have authorization from the

21      principal or principals of the corporation to represent the

22      corporation on this matter, as well as the other matters on

23      today's calendar?

24           MR. RUSSO:  I do, Your Honor.

25           THE COURT:  Okay.  And then with regard to 71631

-PROCEEDINGS-

1    and Kids-On-Call Pediatric Nurse Practitioner, counts one

2    through three, would you like to enter an arraignment plea

3    on behalf of the corporation at this time?

4              MR. RUSSO:  Certainly, Your Honor.

5              At this time I'll waive a public reading and enter

6    a plea of not guilty.

7              THE COURT:  All right.  Thank you.

8              And it's my understanding that Ms. DeVuono is the

9    sole principal of Kids-On-Call Pediatric Nurse

10   Practitioner, correct?

11             MR. RUSSO:  You are correct.

12             THE COURT:  Good afternoon, again, Ms. DeVuono.

13             Ms. DeVuono, I've had, as you know, many meetings

14   with your Counsel and the prosecutor, and Mr. Russo tells

15   me today that he has made an agreement on behalf of the

16   prosecutor's office as to how to resolve your case.  And it

17   is my understanding that you would like to take advantage

18   of that agreement.

19             Is that correct?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  All right.  Thank you.

22             And what I would like to do at this time -- and I

23   understand, Mr. Bartens, that there is a written and

24   executed plea agreement, as well as a written and executed

25   surrender of licenses pursuant to this plea agreement?

1          MR. BARTENS:  Yes, Your Honor.

2          We ask that a copy be marked as Court Exhibits I,

3     II and III.

4          The defendant has executed the plea agreement, the

5     surrender of her nurse practitioner license, as well as her

6     registered nurse license, and also surrendering the

7     certificate of corporation for the professional company of

8     Kids-On-Call Pediatric Nurse PC.

9          THE COURT:  Thank you.

10         And, Mr. Russo, do you consent to these three

11    exhibits being marked as Court exhibits?

12         MR. RUSSO:  I do consent.

13         THE COURT:  All right then.  The plea agreement

14    will be marked as Court Exhibit I.

15         The application to surrender license will be Court

16    Exhibit II.

17         And the application to surrender the corporate

18    certificate is Court Exhibit III.

19         And that having been accomplished, Mr. Bartens,

20    can you walk us through briefly the agreed-upon pleas and

21    sentences?

22         MR. BARTENS:  Thank you, Your Honor.

23         Your Honor --

24         THE COURT:  Oh, hold on one second.

25         And, Mr. Russo and Ms. DeVuono, I need you to

1    listen carefully to make sure -- Mr. Russo, if Mr. Bartens

2    says anything different than you and your client have

3    agreed to, let me know, and we'll see if we can remedy any

4    misunderstanding, okay?

5              MR. RUSSO:  Sure, Judge.

6              THE COURT:  If you would, please, Mr. Bartens?

7              MR. BARTENS:  Thank you, Your Honor.

8              Under Indictment 70771-23/001, the defendant will

9    be pleading guilty to count one, Money Laundering in the

10   Second Degree, a Class C felony.

11             Under Indictment No. 71631-23/001, the defendant

12   will be pleading guilty to count two, Forgery in the Second

13   Degree, a Class D felony.

14             Under Indictment No. 70807-23, the defendant will

15   be pleading guilty to count one, Offering a False

16   Instrument For Filing in the First Degree, a Class E

17   felony.

18             The defendant will be sentenced a concurrent

19   sentence, pursuant to the plea agreement, for each one of

20   these counts to six months in jail, followed by five years

21   of probation, with alcohol and narcotics conditions.  In

22   lieu of serving six months in jail, the defendant is being

23   offered the opportunity to do 840 hours of community

24   service.

25             The defendant will also be fined $5,000 per felony

1       for a total of $15,000.

2              The defendant has also entered into a forfeiture

3       stipulation agreement with the Suffolk County District

4       Attorney's Office, as well as for Kids-On-Call Pediatric

5       Nurse Practitioner PC.  The total amount of that forfeiture

6       stipulation is $1,252,540.63.

7              Also part of this plea negotiation, the defendant

8       will surrender all of her professional licenses as

9       mentioned just previously.  The defendant has executed

10      paperwork for her nurse practitioner and her registered

11      nurse licenses to The State Education Department.

12             The defendant is also surrendering her certificate

13      of incorporation for Kids-On-Call Pediatric Nurse

14      Practitioner PC to The State Education Department.

15             Also, as per the agreement, the defendant must

16      have closed by today her professional practice known as

17      Wild Child Pediatric Healthcare, also known as Kids-On-Call

18      Pediatric Nurse Practitioner PC.

19             The defendant will provide The People and The

20      Court proof that the defendant has implemented the

21      necessary methods in order to accomplish this closure,

22      including but not limited to the conditions set forth

23      within the plea agreement, as attached as Exhibit A.

24             The defendant, as also a condition of the this

25      plea, must truthfully testify at any trial, hearing or

1    other court proceeding with respect to The People v. Karen

2    Colletti, Indictment No. 71631-23/003.

3            If the defendant fails to abide by the terms of

4    this plea agreement, The People will recommend a sentence

5    of no less than three to nine years of incarceration on the

6    Money Laundering in the Second Degree charge to run

7    consecutively to two to six years on the Forgery in the

8    Second Degree charge, which will also run consecutive to

9    the one to three years on the Offering of a False

10   Instrument For Filing in the First Degree charge.

11           Your Honor, with respect to the corporation,

12   Kids-On-Call Pediatric Nurse Practitioner PC, that

13   corporation will be entering a plea of guilty to count one,

14   Money Laundering in the Second Degree, which is under

15   Indictment No. 70771-23/002.

16           The defendant corporation will also be entering a

17   plea of guilty to Forgery in the Second Degree, under

18   Indictment No. 71631-23/002.

19           That corporation, as just previously stated, also

20   entered into a stipulation forfeiture agreement with

21   Defendant DeVuono.  The agreed-upon sentence for the

22   corporation will be conditional discharges as to each

23   felony.

24           THE COURT:  All right.  Thank you.

25           And it's also my understanding, with regard to the

1        agreed-upon forfeiture, that the husband of Defendant

2        DeVuono is also a party to the forfeiture, as he apparently

3        is the owner of the home, which will be the collateral for

4        the home equity loan that will satisfy the remainder of the

5        $1,252,540 in change, as it is my understanding that The

6        People have now, in their possession, some $932,000

7        already.  And the home equity loan for the remainder

8        required that the husband be a party to the agreement.

9                Is that also correct?

10               MR. BARTENS:  That is correct, Your Honor.

11               MR. RUSSO:  That's correct, Judge.

12               THE COURT:  Okay.  And one other thing.

13               I think by agreement, assuming that the plea goes

14       forward, I'm going to lift the curfew that is currently

15       imposed upon the defendant; however, we will keep the GPS

16       conditions in effect.

17               There will be a form that you and your client need

18       to sign, Mr. Russo, and that will enable the GPS conditions

19       to be extended for another 60 days.  And we'll have her

20       return to court within that 60-day period, whether the

21       sentence occurs at that time or not, but we will -- you

22       will appear again in the event it needs to be extended.

23               Fair enough?

24               MR. RUSSO:  Fair enough, Judge.

25               Thank you very much.

-PROCEEDINGS-

1          THE COURT:  All right.  That having been said,

2     Mr. Russo, is that your understanding?

3          MR. RUSSO:  Yes, it is, Judge, in its entirety.

4          THE COURT:  Thank you.

5          And, Ms. DeVuono, is that your understanding as

6     well?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  And, Mr. Russo, do you have any

9     objection to Ms. DeVuono being sworn?

10          MR. RUSSO:  None.

11          THE COURT:  All right.  Ms. DeVuono, please raise

12     your right hand.

13          Pay careful attention to the Clerk of The Court,

14     and then you and I will talk some more.

15          COURT CLERK:  Do you solemnly swear or affirm the

16     testimony you're about to give before This Court will be

17     the truth, the whole truth and nothing but the truth?

18          THE DEFENDANT:  Yes.

19          COURT CLERK:  You could put your hand down.

20          In a nice loud, clear voice please state your

21     name.

22          THE DEFENDANT:  Julie DeVuono.

23          COURT CLERK:  Date of birth?

24          THE DEFENDANT:  7/28/72.

25          COURT CLERK:  And your address?

-PROCEEDINGS-

1          THE DEFENDANT:  47 Bourdette Place, Amityville,

2     New York 11701.

3          THE COURT:  Thank you.

4          Ms. DeVuono, would you please tell me how old you

5     are?

6          THE DEFENDANT:  I'm 51 years old.

7          THE COURT:  You're right.

8          Do you read, write and understand the English

9     language?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  And are you a citizen of these United

12     States?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  All right.  Mr. Russo, I think what

15     we'll do first is deal with the corporate plea, and then

16     we'll double back to Ms. DeVuono.

17          MR. RUSSO:  That works, Judge.  Yes.

18          THE COURT:  Okay.  Very well then.  Mr. Russo,

19     having authority from the principal of the corporation,

20     with respect to Indictment 70771-23 and count one, Money

21     Laundering in the Second Degree, does the corporation plead

22     guilty to that offense to satisfy all the charges in that

23     indictment regarding the corporation?

24          MR. RUSSO:  Yes.

25          I have been authorized to enter that plea, and I

1    do so at this time.

2              THE COURT:  Thank you.

3              And with regard to the corporation charged in

4    71631-23 and count number two, Forgery in the Second

5    Degree, does the corporation now enter a guilty plea to

6    Forgery in the Second Degree to satisfy all the charges

7    contained in that indictment as against the corporation?

8              MR. RUSSO:  Yes, Judge.

9              I have been authorized by my client and I do so.

10             THE COURT:  All right.  The Court accepts both

11   guilty pleas on behalf of the corporation, having been

12   entered by Mr. Russo, who is authorized by the corporate

13   principals to represent the corporation and I'm satisfied

14   that he was properly authorized and The Court accepts the

15   pleas on behalf of the corporation at this time.

16             There is an agreement to conditionally discharge

17   both of those corporations; however, that will take place

18   at sentencing.

19             MR. RUSSO:  Okay.

20             THE COURT:  All right.  Thank you.

21             Now, Mr. Russo, with respect to Ms. DeVuono

22   personally, with regard to 71 -- I'm sorry, 70771-23, Money

23   Laundering in the Second Degree?

24             MR. RUSSO:  Judge, my client has authorized me to

25   withdraw her previously-entered plea of not guilty and

1      enter a plea of guilty to that charge.

2      THE COURT:  Okay.  And that's meant to satisfy all

3      the charges contained in that instrument?

4      MR. RUSSO:  It is, Your Honor.

5      THE COURT:  All right.  Thank you.

6      And then with regard to 71631-23, Forgery in the

7      Second Degree, which is contained in count two, I'll hear

8      what you have to say in that regard.

9      MR. RUSSO:  Judge, my client has authorized me to

10      withdraw her previously-entered plea of not guilty and

11      enter a plea of guilty to that charge in satisfaction of

12      the indictment.

13      THE COURT:  All right.  Thank you.

14      And then with regard to 70807-23, and in

15      particular count one, Offering a False Instrument For

16      Filing, I'll hear what you have to say.

17      MR. RUSSO:  Judge, my client has authorized me to

18      withdraw her previously-entered plea of not guilty and

19      enter a plea of guilty to that charge in satisfaction of

20      the indictment.

21      THE COURT:  All right.  Thank you.

22      All right.  Ms. DeVuono, did you hear your

23      attorney, Mr. Russo, offer to withdraw all of your

24      previously entered not guilty pleas and offer to have you

25      plead guilty with respect to 70771-23, Money Laundering in

-PROCEEDINGS-

1          the Second Degree; with regard to 71631, Forgery in the

2          Second Degree; and with regard to 70807, Offering A False

3          Instrument For Filing off count one, did you hear Mr. Russo

4          offer to withdraw your previously-entered pleas of not

5          guilty and offer to have you plead guilty to those three

6          offenses?

7                    THE DEFENDANT:  Yes, Your Honor.

8                    THE COURT:  And do you understand that each of

9          those offenses is a felony?

10                    THE DEFENDANT:  Yes, Your Honor.

11                    THE COURT:  And did you authorize Mr. Russo to

12          enter those guilty pleas on your behalf?

13                    THE DEFENDANT:  Yes, Your Honor.

14                    THE COURT:  And have you had time both today and

15          in the past to speak with Mr. Russo about how to handle

16          your case?

17                    THE DEFENDANT:  Yes.

18                    THE COURT:  And have you had enough time to do

19          that?

20                    THE DEFENDANT:  Yes.

21                    THE COURT:  And are you satisfied with how

22          Mr. Russo has represented you?

23                    THE DEFENDANT:  Yes, Your Honor.

24                    THE COURT:  You ought to be.

25                    Do you understand that by pleading guilty today

1    you'll be giving up a number of your Constitutional rights?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  I'm gonna walk through those rights

4    with you now anyway so please listen carefully.

5              You'll be giving up your right to a trial by me or

6    a jury of your peers.  You'll be giving up your right to

7    face and cross-examine your accusers.  You'll be giving up

8    your right to remain silent.  You'll be giving up your

9    right to call witnesses on your own behalf or to submit

10   evidence on your own behalf.  And you'll be giving up your

11   right to have The People prove these cases against you

12   beyond a reasonable doubt.

13             Do you understand?

14             THE DEFENDANT:  Yes.

15             THE COURT:  And is that what you wish to do?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  And it's also my understanding,

18   Mr. Russo, that after consultation with you, Ms. DeVuono is

19   willing to give up her separate and distinct Constitutional

20   right of appeal in order to take advantage of this plea and

21   sentence agreement.

22             Is that correct, sir?

23             THE DEFENDANT:  That.

24             MR. RUSSO:  That's correct, Judge.

25             I have fully explained to her her separate and

1    distinct right to appeal, and she has authorized that.

2              THE COURT:  Is that's correct, ma'am?

3              THE DEFENDANT:  Yes.

4              THE COURT:  And did Mr. Russo explain to your

5    satisfaction the impact of giving up your right of appeal

6    today?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  And did he answer any questions you

9    may have had in that regard?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Do you have any questions for him or

12   me at this time with regard to your waiver of the right of

13   appeal?

14             THE DEFENDANT:  No.

15             THE COURT:  All right.  There are some things

16   according to the law that I have to tell you anyway so

17   please listen carefully.

18             A defendant ordinarily retains a separate and

19   distinct right of appeal even after they plead guilty.  In

20   this case, however, as a condition of the plea agreement,

21   you're being asked to waive your right of appeal in order

22   to accept the plea and sentence agreement.

23             Is that your understanding?

24             THE DEFENDANT:  Yes.

25             THE COURT:  And is that what you wish to do?

1    THE DEFENDANT:  Yes, Your Honor.

2    THE COURT:  And an appeal is generally a

3    proceeding before a different court.  If you can't afford a

4    lawyer to represent you in that Appellate Court, The State

5    will pay for a lawyer to represent you.

6    Do you understand?

7    THE DEFENDANT:  Yes.

8    THE COURT:  And on that appeal a defendant may,

9    normally, through that attorney, argue that some sort of

10    error took place in This Court which would require a

11    modification or a reversal of your conviction.  If, in

12    fact, your conviction is reversed, it could require either

13    new proceedings here or even perhaps an outright dismissal

14    of the charges against you in the first place.

15    Do you understand?

16    THE DEFENDANT:  Yes, Your Honor.

17    THE COURT:  And by waiving your right of appeal

18    today you don't necessarily give up your right to take an

19    appeal.  But if you do take an appeal you are, by this plea

20    and waiver today, giving up your right to have the

21    Appellate Court consider, what I call, most ordinary claims

22    of error, which include, for example, any rulings that

23    might have been made on the evidence, discovery,

24    suppression of evidence, any pretrial motions your attorney

25    might have made on your behalf and whether the sentence you

1    ultimately receive here is harsh or excessive and needs to

2    be modified.

3              Do you understand?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  And did Mr. Russo explain those things

6    to you ahead of time?

7              THE DEFENDANT:  Yes.

8              THE COURT:  And are you willing to give up your

9    right of appeal today in this case in return for the plea

10   and sentence agreement voluntarily and of your own

11   freewill?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  All right.  Thank you.

14             I'm satisfied that Ms. DeVuono has made a knowing,

15   intelligent, voluntary and fully-informed waiver of her

16   appellate rights, and I accept the waiver at this time.

17             Do you understand further, ma'am, that if I accept

18   your guilty plea here today or your guilty pleas here today

19   it will be the same as if you were found guilty after

20   trials of the three charges to which you are pleading?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Do you understand further that if I

23   accept your guilty pleas you'll be giving up all those

24   rights we just talked about, including your right of

25   appeal, and it will be the same as if you were convicted

1    after a trial of the three charges to which you are

2    pleading?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  Are you pleading guilty today

5    voluntarily and of your own freewill?

6            THE DEFENDANT:  Yes.

7            THE COURT:  Has anybody forced or threatened you

8    to plead guilty?

9            THE DEFENDANT:  No.

10           THE COURT:  Has anyone promised you anything else

11   to get you to plead guilty, other than that which you, me,

12   Mr. Russo and Mr. Bartens have discussed here in court

13   today and are contained in your executed plea agreement?

14           THE DEFENDANT:  No.

15           THE COURT:  Okay.  Are you pleading guilty here

16   today because you are actually guilty?

17           THE DEFENDANT:  Yes.

18           THE COURT:  And as you stand here today are you

19   under the influence of any medications, drugs or alcohol

20   that would affect your ability to clearly understand what

21   you and I are talking about?

22           THE DEFENDANT:  No, Your Honor.

23           THE COURT:  And, further, do you understand that

24   by pleading guilty you'll be giving any possible defense

25   you might have had to any of these charges?

1        THE DEFENDANT:  Yes, Your Honor.

2        THE COURT:  And, finally, do you understand and

3    did Mr. Russo explain that today you're pleading guilty to

4    three separate and distinct felonies?

5        THE DEFENDANT:  Yes.

6        THE COURT:  And did he explain and do you

7    understand that the plea and sentence in this case could

8    pose some problems for you in the future?

9        THE DEFENDANT:  Yes.

10        THE COURT:  And did he explain and do you

11    understand that as a result of the pleas and sentences in

12    this case should you be convicted of any new felonies in

13    the future, you can possibly face enhanced sentencing on

14    those new cases because of the existence of these cases?

15        THE DEFENDANT:  Yes, Your Honor.

16        THE COURT:  All right.  Thank you.

17        And do you understand that I'm going to set a

18    sentencing date for you in the future, and you need to come

19    back on the day that I tell you to come back?

20        Do you understand?

21        THE DEFENDANT:  Yes.

22        THE COURT:  And do you understand that if you

23    don't come back or if you get arrested for or charged with

24    any new crimes between now and the time of your sentence,

25    I'm not going to give you back your pleas and I'm not going

1     to honor the promises that have been made today and I will

2     consider it a violation of your plea agreement and I could

3     possibly impose those breakout sentences that were spoken

4     of?

5            Do you understand?

6            THE DEFENDANT: Yes, Your Honor.

7            THE COURT: Thank you.

8            All right. Ma'am, I remind you that you're still

9     under oath. Mr. Bartens now from the prosecutor's office

10    is going to ask you some questions about all of the events

11    we're talking about. And I advise you also you have an

12    absolute right to talk to Mr. Russo first before you answer

13    any of the prosecutor's questions.

14           Do you understand?

15           THE DEFENDANT: Yes.

16           THE COURT: Mr. Bartens?

17           MR. BARTENS: Thank you, Your Honor.

18           Ms. DeVuono, showing you an 18-page document

19    entitled the plea agreement (indicating).

20           Do you recognize this document (indicating)?

21           THE DEFENDANT: Yes.

22           MR. BARTENS: Did Mr. Russo go over this document

23    with you?

24           THE DEFENDANT: Yes.

25           MR. BARTENS: And did you understand it after he

- PROCEEDINGS-

1          went through it with you?

2                    THE DEFENDANT:  Yes.

3                    MR. BARTENS:  And then on Page No. 11 was there a

4          correction made to this agreement that was in pen that was

5          signed by both -- initialled by both yourself --

6                    THE DEFENDANT:  Yes.

7                    MR. BARTENS:  -- Mr. Russo and myself, correct?

8                    THE DEFENDANT:  Yes.

9                    MR. BARTENS:  Okay.  And did you voluntarily sign

10         and agree to the terms of this agreement?

11                   THE DEFENDANT:  Yes.

12                   MR. BARTENS:  Are the admissions contained within

13         this agreement accurate?

14                   THE DEFENDANT:  Yes.

15                   THE COURT:  That would be Court Exhibit I?

16                   MR. BARTENS:  Yes, Your Honor.

17                   Now, discussing Court Exhibit II, the application

18         of -- application for surrender of licenses, I'm showing

19         you this multipage document (indicating).

20                   Did Mr. Russo go over this document with you

21         (indicating)?

22                   THE DEFENDANT:  Yes.

23                   MR. BARTENS:  And did you understand its contents?

24                   THE DEFENDANT:  Yes.

25                   MR. BARTENS:  And were the admissions within it

1          accurate?

2                    THE DEFENDANT:  Yes.

3                    MR. BARTENS:  And did you voluntarily sign this

4          document?

5                    THE DEFENDANT:  Yes.

6                    MR. BARTENS:  And, finally, showing you Court

7          Exhibit III, the application to surrender the certificate

8          of incorporation (indicating).

9                    Did Mr. Russo go through this document with you

10         (indicating)?

11                   THE DEFENDANT:  Yes.

12                   MR. BARTENS:  And did you understand this

13         document?

14                   THE DEFENDANT:  Yes.

15                   MR. BARTENS:  And did you voluntarily sign this

16         document on behalf of the corporation?

17                   THE DEFENDANT:  Yes.

18                   MR. BARTENS:  Now turning to the facts of this

19         case.

20                   With regards to Indictment No. 70771-23/001, count

21         one, Money Laundering in the Second Degree, Ms. DeVuono,

22         during the time period of June 15, 2021 to June 2nd of

23         2022, were you the owner of Kids-On-Call Pediatric Nurse

24         Practitioner PC?

25                   THE DEFENDANT:  Yes.

1          MR. BARTENS:  Was this corporation also referred

2     to as Kids-On-Call PNP PC, Kids-On-Call Pediatric NP PC,

3     Kids-On-Call Pediatric Nurse and Wild Child Pediatric

4     Healthcare?

5          THE DEFENDANT:  Yes.

6          MR. BARTENS:  We will refer to this corporation

7     simply as Kids-On-Call for this, okay?

8          THE DEFENDANT:  Okay.

9          MR. BARTENS:  Was this a pediatric healthcare

10     practice?

11          THE DEFENDANT:  Yes.

12          MR. BARTENS:  Did you sometimes treat adults there

13     as well?

14          THE DEFENDANT:  Yes.

15          MR. BARTENS:  And that was for the COVID-19

16     vaccination?

17          THE DEFENDANT:  Yes.

18          MR. BARTENS:  And did you run this business?

19          THE DEFENDANT:  Yes.

20          MR. BARTENS:  What type of medical licenses did

21     you have?

22          THE DEFENDANT:  Pediatric nurse practitioner and

23     registered nurse.

24          MR. BARTENS:  Is your Nurse Practitioner License

25     No. 381563?

1        THE DEFENDANT:  Yes.

2        MR. BARTENS:  And is your Registered Professional

3   License No. 531035?

4        THE DEFENDANT:  Yes.

5        MR. BARTENS:  Was the office for this business

6   located at 176B Park Avenue, Amityville, Suffolk County,

7   New York?

8        THE DEFENDANT:  Yes.

9        MR. BARTENS:  Did you employ Karen Colletti, Heidi

10  Kubit, Kathleen Camarata, Brooke Hogan and Marissa Urraro?

11       THE DEFENDANT:  Yes.

12       MR. BARTENS:  During this time period, did you,

13  while acting in concert with others, including Karen

14  Colletti, Heidi Kubit, Brooke Hogan, Kathleen Camarata and

15  Marissa Urraro, sell forged COVID-19 vaccination record

16  cards?

17       THE DEFENDANT:  Yes.

18       MR. BARTENS:  Were these COVID-19 vaccination

19  record cards forged because you and these individuals

20  entered onto these record vaccination cards information

21  that the purported patient received a COVID-19 vaccination

22  when, in fact, they had not?

23       THE DEFENDANT:  Yes.

24       MR. BARTENS:  Were these forged vaccination record

25  cards official documents generated by the United States

1    Department of Health and Human Services, Centers Disease

2    Control and Prevention?

3            We'll call it CDC for short.

4            Correct?

5            THE DEFENDANT:  Yes.

6            MR. BARTENS:  Did you commit these forgeries by,

7    among other methods, making false entries on those cards

8    indicating that vaccines had been administered to the

9    purported patients when, in fact, no such vaccines were

10   administered?

11           THE DEFENDANT:  Yes.

12           MR. BARTENS:  And did the false entries that you

13   made include making writings and placing stickers on the

14   COVID-19 vaccination record cards, which indicated that the

15   vaccines had been administered when, in fact, they had not

16   been administered?

17           Is that correct?

18           THE DEFENDANT:  Yes.

19           MR. BARTENS:  Furthermore, did you order your

20   employees to make false entries into the New York State

21   Immunization Information System database, known as NYSIIS,

22   indicating that the purported patients had received

23   vaccinations for when you, in fact -- from when, in fact,

24   no such vaccination had been administered?

25           THE DEFENDANT:  Yes.

-PROCEEDINGS-

1          MR. BARTENS:  Okay.  Did Karen Colletti, Kathleen

2     Camarata, Heidi Kubit and Brooke Hogan make those entries

3     under your supervision at your direction?

4          THE DEFENDANT:  Yes.

5          MR. BARTENS:  Did those individuals make those

6     entries with the knowledge that no such vaccinations were

7     delivered?

8          THE DEFENDANT:  Yes.

9          MR. BARTENS:  Did you have permission from the CDC

10    to enter this false information onto these CDC COVID-19

11    vaccination record cards?

12         THE DEFENDANT:  No.

13         MR. BARTENS:  Okay.  If administered properly, the

14    COVID vaccinations were required to be administered in two

15    doses at least three weeks apart, correct?

16         THE DEFENDANT:  Yes.

17         MR. BARTENS:  Did you, Karen Colletti, Kathleen

18    Camarata, Heidi Kubit, Brooke Hogan and Marissa Urraro

19    charge customers $220 for each false vaccination entry on

20    these forged COVID-19 vaccination record cards?

21         THE DEFENDANT:  Yes.

22         MR. BARTENS:  Accordingly, did you and these

23    individuals charge $440 to have both required but falsify

24    vaccination entries made onto these records?

25         THE DEFENDANT:  Yes.

1          MR. BARTENS:  Okay.  And did the vast majority of

2     these customers who received the forged vaccination record

3     cards pay in cash and credit card?

4          THE DEFENDANT:  Yes.

5          MR. BARTENS:  Now, turning more specifically to

6     the Money Laundering in the Second Degree count.  Again,

7     during the time period of June 15, 2021 to June 2nd of

8     2022, in Suffolk County, New York, did you conduct one or

9     more financial transactions knowing that the money involved

10    in the transactions represented the proceeds of specified

11    criminal conduct, namely, the proceeds from the sale of

12    forged COVID-19 vaccination record cards?

13         THE DEFENDANT:  Yes.

14         MR. BARTENS:  Did you know that these

15    transactions, in whole or in part, were designed to conceal

16    or disguise the nature, the location, the source, the

17    ownership or the control of the proceeds of specified

18    criminal conduct?

19         THE DEFENDANT:  Yes.

20         MR. BARTENS:  Did you know the total value of the

21    money involved in such financial transactions exceeded

22    $100,000?

23         THE DEFENDANT:  Yes.

24         MR. BARTENS:  Now, specifically, during the time

25    period between June 15th of 2021 and January 27th of 2022,

1     did you transfer from your Bomaid account, also known as a

2     Square account, into your Kids-On-Call business account at

3     Bank of America -- we'll call that BOA for short -- account

4     ending 9744, proceeds from the sale of the forged COVID-19

5     vaccination record cards?

6             THE DEFENDANT: Yes.

7             MR. BARTENS: Did you also deposit during this

8     time period into this Bank of America account customers'

9     personal checks for the sale of the forged COVID-19

10    vaccination record cards?

11           THE DEFENDANT: Yes.

12           MR. BARTENS: Was the total value of these

13    transfers and deposits into this BOA during this time

14    period $461,870?

15           THE DEFENDANT: Yes.

16           MR. BARTENS: Also, during the time period of

17    June 15, 2021 to January 27th of 2022, did you transfer

18    from the Kids-On-Call BOA business account into your

19    personal BOA account, ending in 6875, criminal proceeds

20    from the sale of COVID-19 vaccination record cards that

21    totalled $403,800?

22           THE DEFENDANT: Yes.

23           MR. BARTENS: On January 31st of 2022, four days

24    after you were arrested, did you do a wire transfer for

25    $236,980.20 from your personal BOA account, ending in 6875,

1          to pay off a Wells Fargo mortgage for your home in

2          Amityville that was in the name of your husband, Derin

3          DeVuono?

4                    THE DEFENDANT:  Yes.

5                    MR. BARTENS:  On April 29th of 2022, did Bank of

6          America close your personal Bank of America account, ending

7          in 6875, due to fraudulent activity?

8                    THE DEFENDANT:  Yes.

9                    MR. BARTENS:  Were you issued a cashier's check

10         for the balance of the account for the amount of

11         $331,044.63?

12                   THE DEFENDANT:  Yes.

13                   MR. BARTENS:  Did you then open a personal account

14         in your name with Citibank, account ending 4139?

15                   THE DEFENDANT:  Yes.

16                   MR. BARTENS:  Did you then deposit on May 2, 2022

17         the cashier's check from Bank of America into your personal

18         Citibank account, ending in 4139?

19                   THE DEFENDANT:  Yes.

20                   MR. BARTENS:  On May 23rd of 2022, did you

21         transfer from your personal Citibank savings account,

22         ending in 4139, to your personal Citibank account, ending

23         in 4120, $100,000?

24                   THE DEFENDANT:  Yes.

25                   MR. BARTENS:  On May 25th of 2022, did you

1    purchase gold coins by wiring the Texas Precious Metals

2    Company $78,423.39 from your Citibank checking account,

3    ending in 4120; and $13,813.04 from your Citibank savings

4    account, ending in 4139?

5           THE DEFENDANT:  Yes.

6           MR. BARTENS:  Were all of these transactions done

7    in order to conceal or disguise the nature, the location

8    and the source of the monies, that being the proceeds from

9    sale of the forged COVID-19 vaccination record cards?

10          THE DEFENDANT:  Yes.

11          MR. BARTENS:  Okay.  Now, turning to Indictment

12    No. 71631-23/001, count two, which is Forgery in the Second

13    Degree, Ms. DeVuono, on October 19th of 2021, were you at

14    your practice, Wild Child Pediatrics, in Amityville,

15    Suffolk County, New York?

16          THE DEFENDANT:  Yes.

17          MR. BARTENS:  Okay.  Did you discuss in front of

18    Karen Colletti the method by which you and others would

19    create forged vaccination record cards and make false

20    entries regarding those vaccination record cards on those

21    vaccine cards and in the New York State NYSIIS database?

22          THE DEFENDANT:  Yes.

23          MR. BARTENS:  And did you discuss how and how much

24    you would charge purported patients for those forged

25    vaccination record cards with Karen Colletti, Kathleen

1    Camarata and Heidi Kubit?

2              THE DEFENDANT:  Yes.

3              MR. BARTENS:  On October 19, 2021, was Karen

4    Colletti working with you as a receptionist at Wild Child?

5              THE DEFENDANT:  Yes.

6              MR. BARTENS:  On that date, while acting in

7    concert with Karen Colletti, with intent to defraud,

8    deceive or injure another, did you and Karen Colletti

9    falsely make, complete or alter a written instrument which

10   was or purported to be, or which was calculated to become

11   or represented if completed a written instrument officially

12   issued or created by a public office, public servant or

13   government instrumentality?

14             THE DEFENDANT:  Yes.

15             MR. BARTENS:  Namely, did you and Karen Colletti,

16   while acting in concert, enter false vaccination

17   information onto a COVID-19 vaccination record card without

18   the permission of the CDC?

19             THE DEFENDANT:  Yes.

20             MR. BARTENS:  That false information was regarding

21   a customer named Thomas Laviano, which falsely documented

22   that he received his second COVID-19 vaccination that day

23   at Wild Child, correct?

24             THE DEFENDANT:  Yes.

25             MR. BARTENS:  Now, specifically, did Colletti

1    complete the forged card that day by writing the date

2    October 19, 2019 on the COVID-19 vaccination record card

3    indicating that Thomas Laviano received the vaccination

4    that day?

5              THE DEFENDANT:  Yes.

6              MR. BARTENS:  Did Colletti also attach a sticker

7    stating that the COVID-19 vaccination was from Pfizer and

8    the lot number for the vaccine?

9              THE DEFENDANT:  Yes.

10             MR. BARTENS:  Did Colletti also attach to complete

11   the forged COVID-19 vaccination record card a sticker

12   stating your name and your license number as the provider

13   of the COVID-19 vaccination that day?

14             THE DEFENDANT:  Yes.

15             MR. BARTENS:  Did you or anyone else at your

16   office administer a COVID-19 vaccination to Mr. Laviano

17   that day?

18             THE DEFENDANT:  No.

19             MR. BARTENS:  And were you present when

20   Ms. Colletti filled out the forged COVID-19 vaccination

21   record card for Mr. Laviano, including placing the stickers

22   on it?

23             THE DEFENDANT:  Yes.

24             MR. BARTENS:  Ms. Colletti attempted to charge

25   Thomas Laviano $220 for the forged COVID-19 vaccination

1    record card on October 19, 2021, correct?

2          THE DEFENDANT: Yes.

3          MR. BARTENS: Karen Colletti knew that the

4    COVID-19 vaccination record card that she was selling to

5    Thomas Laviano that day was, in fact, forged and that no

6    vaccination had been administered to Mr. Laviano that day,

7    correct?

8          THE DEFENDANT: Yes.

9          MR. BARTENS: That is because each of you were

10    within earshot of one another when the entire transaction

11    took place, right?

12          THE DEFENDANT: Yes.

13          MR. BARTENS: Karen Colletti knew that the

14    customers were paying $220 per entry on a forged COVID-19

15    vaccination record card, correct?

16          THE DEFENDANT: Yes.

17          MR. BARTENS: Okay. You set the price and your

18    employees knew the price, correct?

19          THE DEFENDANT: Yes.

20          MR. BARTENS: Karen Colletti followed your

21    directions, correct?

22          THE DEFENDANT: Yes.

23          MR. BARTENS: In fact, you observed Ms. Colletti

24    complete multiple false entries on several COVID-19

25    vaccination record cards, correct?

1          THE DEFENDANT:  Yes.

2          MR. BARTENS:  In fact, no vaccinations were

3    administered for patients who received cards from Karen

4    Colletti in your presence, correct?

5          THE DEFENDANT:  Yes.

6          MR. BARTENS:  Nonetheless, $220 were collected for

7    shots not administered?

8          THE DEFENDANT:  Yes.

9          MR. BARTENS:  Okay.  Now turning to Indictment No.

10   70807-23, count one, Offering a False Instrument For Filing

11   in the First Degree, Ms. DeVuono, on February 10th of 2019,

12   did you knowingly and electronically file with the

13   Walgreens Pharmacy, located in Amityville, Suffolk County,

14   New York, a prescription for an individual named Diamond

15   Lachappelle?

16         THE DEFENDANT:  Yes.

17         MR. BARTENS:  And when you electronically filed

18   that prescription with Walgreens, did you do so knowing

19   that it would be later filed with the New York State

20   Department of Health as required by law?

21         THE DEFENDANT:  Yes.

22         MR. BARTENS:  The individual named Diamond

23   Lachappelle, for whom you purported to write that

24   prescription, is your brother, correct?

25         THE DEFENDANT:  Yes.

1        MR. BARTENS:  On or about February 10, 2019, your

2    brother, Diamond Lachappelle, lived in the State of Rhode

3    Island, correct?

4        THE DEFENDANT:  Yes.

5        MR. BARTENS:  Was your brother Diamond a patient

6    of yours at that time?

7        THE DEFENDANT:  No.

8        MR. BARTENS:  In fact, your brother Diamond had no

9    idea that you were writing and filing a prescription in his

10   name on that day or any other day, correct?

11       THE DEFENDANT:  Yes.

12       MR. BARTENS:  And, in fact, he did not consent for

13   you to issue that prescription in his name, correct?

14       THE DEFENDANT:  Yes.

15       MR. BARTENS:  The prescription that you wrote and

16   filled in your brother's name on February 10th of 2019 was

17   a prescription for 180 Oxycodone tablets, correct?

18       THE DEFENDANT:  Yes.

19       MR. BARTENS:  You provided false information on

20   this Oxycodone prescription that you wrote and filled and

21   filed in your brother's name, correct?

22       THE DEFENDANT:  Yes.

23       MR. BARTENS:  Did this false information on the

24   prescription for Oxycodone include the claim that your

25   brother, Diamond Lachappelle, was your patient when, in

1      fact, he was not?

2                  THE DEFENDANT:  Yes.

3                  MR. BARTENS:  Did the false information on the

4      prescription of Oxycodone that you filed also include the

5      claim that your brother Diamond's telephone number was

6      631-994-5599?

7                  THE DEFENDANT:  Yes.

8                  MR. BARTENS:  And you knew, in fact, that this was

9      not his telephone number, correct?

10                 THE DEFENDANT:  Yes.

11                 MR. BARTENS:  In fact, the 631-994-5599 number was

12     actually your telephone number at the time when you wrote

13     and sent the prescription, correct?

14                 THE DEFENDANT:  Yes.

15                 MR. BARTENS:  The false information on the

16     prescription you filed also claimed that your brother

17     Diamond, the purported patient, lived at the address of 866

18     County Line Road, Amityville, New York, correct?

19                 THE DEFENDANT:  Yes.

20                 MR. BARTENS:  And, in fact, the 866 County Line

21     Road, Amityville, New York address was your home address at

22     the time that you filed the prescription?

23                 THE DEFENDANT:  Yes.

24                 MR. BARTENS:  Your brother Diamond never lived at

25     866 County Line Road in Amityville, correct?

1        THE DEFENDANT:  Yes.

2        MR. BARTENS:  Did you knowingly file this false

3    electronic prescription with the pharmacy with the intent

4    to defraud the pharmacy, as well as with the intent to

5    defraud the New York State Department of Health who you

6    knew keeps these electronic records?

7        THE DEFENDANT:  Yes.

8        MR. BARTENS:  After you wrote and filed that

9    prescription with intent to defraud the pharmacy, as well

10   as defraud the New York State Department of Health who

11   keeps these electronic records, you picked up those 180

12   Oxycodone tablets and kept them for yourself, correct?

13       THE DEFENDANT:  Yes.

14       MR. BARTENS:  Your Honor, The People are

15   satisfied.

16       THE COURT:  All right.  Thank you.

17       And Oxycodone is a narcotic drug, correct?

18       THE DEFENDANT:  Yes.

19       THE COURT:  May I see Mr. Russo and Mr. Bartens up

20   here for a second (indicating)?

21       MR. RUSSO:  Certainly, Judge.

22       (Bench Conference.)

23       MR. RUSSO:  Just one moment, Judge.

24       THE COURT:  Sure.

25       MR. RUSSO:  Thank you, Judge.

-PROCEEDINGS-

1                    THE COURT:  All right.  Thank you, Mr. Russo.

2              Mr. Bartens, I believe you have another question

3        or two?

4                    MR. BARTENS:  Yes.

5              Ms. DeVuono, you had received COVID-19

6        vaccinations from the federal government, correct?

7                    THE DEFENDANT:  Yes.

8                    THE COURT:  The actual medicine?

9                    MR. BARTENS:  Yes.

10             The actual vaccination medicine, correct?

11                   THE DEFENDANT:  Yes.

12                   MR. BARTENS:  And that came with the cards?

13                   THE DEFENDANT:  Yes.

14                   MR. BARTENS:  And what did you do with the actual

15       vaccines?

16                   THE DEFENDANT:  I would discard them in the

17       garbage can.

18                   MR. BARTENS:  Okay.  I also have one other

19       question.

20             Other than the licenses and certificates that you

21       had surrendered today, you don't have any other medical

22       license anywhere in the United States.

23             Is that correct, Ms. DeVuono?

24                   THE DEFENDANT:  No.

25                   THE COURT:  No, you don't?

1          THE DEFENDANT:  No, I do not.

2          THE COURT:  Okay.  Thank you.

3          Thank you, Mr. Bartens.

4          I'm satisfied that Ms. DeVuono has allocuted to

5     facts sufficient to support the crime charged in count one,

6     Money Laundering in the Second Degree, of Indictment

7     70771-23; also, that she has allocuted to facts sufficient

8     to establish the crime committed in 71631, count two,

9     Forgery in the Second Degree; and that she's allocuted to

10    facts sufficient to support the crime charged in 70807-23

11    as well, Offering a False Instrument For Filing, and I find

12    that she did all of those things in a knowing, intelligent,

13    voluntary and fully-informed fashion.

14          Ms. DeVuono, knowing everything that we've talked

15    about here this afternoon, is it still your intention to

16    plead guilty?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  All right then.  How do you plead to

19    Offering a False Instrument For Filing, off Indictment No.

20    70807-23, count one, guilty or not guilty?

21          THE DEFENDANT:  Guilty.

22          THE COURT:  And how do you plead to Forgery in the

23    Second Degree, off count two, in Indictment 71631-23,

24    guilty or not guilty?

25          THE DEFENDANT:  Guilty.

1    THE COURT:  And how do you plead to the crime

2    charged in count one, of Indictment No. 70711-23, Money

3    Laundering in the Second Degree, guilty or not guilty?

4    THE DEFENDANT:  Guilty.

5    THE COURT:  All right.  The Court accepts all

6    three of Ms. DeVuono's guilty pleas, and I find that she

7    entered them in a knowing, intelligent, voluntary and

8    fully-informed fashion.

9    Ms. DeVuono, Mr. Russo is going to take you down

10   the hall and introduce you to the Probation Department.

11   It's their job to do a written report for me in order that

12   you can be legally sentenced at the time of your sentence.

13   I'm sure you could get advice from Mr. Russo as to

14   how to deal with the probation folks, but I'm directing

15   that you at least be cooperative with them, okay?

16   THE DEFENDANT:  Yes.

17   THE COURT:  And we're going to need a day

18   approximately two months down the road that works for you,

19   gentlemen.  I'm leaning toward perhaps November 17th.

20   MR. BARTENS:  That day is good for me.

21   Mr. Russo?

22   MR. RUSSO:  That works.

23   THE COURT:  Mr. Russo?

24   MR. RUSSO:  That works.

25   THE COURT:  That's Friday, November 17th.  That

1      will be the sentencing date.

2              And, again, Ms. DeVuono, recall the warnings that

3      I gave you earlier about making sure you come back; and,

4      number two, not getting in any further trouble in the

5      meantime.

6              THE DEFENDANT:  Yes.

7              THE COURT:  Let the record reflect that the GPS

8      extension form is now being executed, having previously

9      been signed by The Court.

10             You no longer have a curfew, ma'am.

11             THE DEFENDANT:  Okay.

12             THE COURT:  You are, however, yet subject to

13     alcohol, narcotic and home search conditions.

14             Let the record reflect that the appropriate form

15     has been executed, and a copy will go with Mr. Russo and

16     his client when they go to the Probation Department.

17             Mr. Russo, with respect to 70771, 71631 -- I don't

18     think there's a motion pending on 70807-23, is there?

19             MR. RUSSO:  I don't believe so, Judge.

20             MR. BARTENS:  No.

21             MR. RUSSO:  If there are any, I'll withdraw any

22     pending motions.

23             THE COURT:  Well, that's where I was going, but I

24     wanted to cover the three indictments if, in fact, there

25     was one pending on each.

1            MR. RUSSO: So, on all the indictments before The

2   Court today, if there are any motions that are still

3   pending that I may have filed, I hereby withdraw all of

4   them.

5            THE COURT: Terrific.

6            All right. I believe that completes our

7   proceeding, unless there's anything further, Mr. Bartens?

8            MR. BARTENS: No, thank you, Your Honor.

9            THE COURT: Anything further, Mr. Russo?

10           MR. RUSSO: No, thank you, Judge.

11           Thank you for your time and patience with us.

12           THE COURT: You're welcome.

13           Good luck to you, ma'am.

14           THE DEFENDANT: Thank you.

15           **************************

16           This is certified to be a true and accurate

17   transcript of the stenographic notes.

18

19

20

21         *Daniella Chamberlain*

22           DANIELLA CHAMBERLAIN

23           Senior Court Reporter

24

25